## BROOKS v. SOUTHERN RY. CO.*
### No. 8123.

Circuit Court of Appeals, Fifth Circuit.

Dec. 14, 1936.

Rehearing Denied Jan. 12, 1937.

HUTCHESON, Circuit Judge, dissenting.

———◆———

Winfield P. Jones and W. S. Bateman, both of Atlanta, Ga., for appellant.

G. E. Maddox, of Rome, Ga., for appellee.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

FOSTER, Circuit Judge.

This is a suit by a passenger on a railroad to recover damages for personal injuries. The only error assigned is to the direction of a verdict for defendant.

The following facts are shown by undisputed evidence: Plaintiff, Reese Brooks, was a passenger on a train, owned and operated by defendant, on a trip from Atlanta to Villa Rica, Ga., a flag station, on the night of December 27, 1934. The night was dark and rainy. The train consisted of an engine, tender, and five cars. Plaintiff entered the first class coach, which was the fourth car from the engine. He had with him his overcoat and a large, heavy suitcase. Next ahead of this coach was the second class coach, the rear end used as a smoker and the front end partitioned off for colored passengers. The train arrived at Villa Rica about 12:40 or 12:44 a. m. Shortly thereafter plaintiff was seriously injured by the train running over his left leg and badly mangling it, with the result that it had to be amputated. He was found after the accident lying 5 or more feet from the track and a few feet beyond a public road crossing, about 75 feet west of the end of the station towards Birmingham, in which direction the train was proceeding and about 120 feet from where the first class coach stopped. His suitcase and overcoat were lying near him. His trousers were torn where the train had run over him and the backs of his hands showed scratches. Neither his clothing nor his suitcase showed any signs of having been dragged along the platform or over the crossing, both of which were composed of gravel or chert or some similar material. The car in which he was riding was a steel vestibule coach, with several steps leading from the platform of the coach to the ground. The lower step extended two or three inches over the curbing of the platform when the coach was at the station.

The negligence alleged was (1) that the station platform was badly lighted and due to inclement weather it was full of gullies and washed out places and inclined to the curb where passengers alighted and this condition had existed for a long time, so that it was not a safe place for passengers to leave the train: (2) that as plaintiff started to alight the train suddenly and without warning started up, gradually gathering speed, jerking him forward and causing him to be thrown and dragged under the train.

There was no witness to the accident at the moment it happened except plaintiff. His testimony, in substance, was this. He was in the smoker as the train reached Villa Rica. He walked back into the first class coach and picked up his overcoat and suitcase. The conductor of the train was standing out upon the platform, facing the door where he was to get off. He had his suitcase in his right hand and his overcoat

*Writ of certiorari denied 57 S. Ct. —, 81 L. Ed. —.

thrown over his left arm. He put his left foot down on the step, expecting to catch himself on the ground with his right foot but, when he stepped down on the step with his left foot, the train started and gave a jerk, causing him to lose his balance. He began to grab at something with his left hand. He did not know whether he caught hold of anything or not but by that time the train had begun to get some speed. He became so excited that he did not remember anything that happened after that until the time when the wheel of the train hit his leg.

Davis, conductor of the train, testified that he was on the front platform of the first class coach where the passengers left the train. As the train was standing, this was about opposite the white waiting room of the station. A lady got off the train safely and walked away. Plaintiff followed about 10 or 15 seconds later. Plaintiff also alighted safe, turned to the left, and walked out of sight of the conductor. When plaintiff alighted, the flagman was on the ground on the outside of this entrance. About 20 to 30 seconds after plaintiff left the train, the conductor gave the signal for the engineer to move the train. The train did not move for 10 to 15 seconds after that. McWhorter, the engineer of the train, confirmed Davis as to the position of the train at the station and stated that he waited 10 or 15 seconds after he got the signal to move, by two blasts on the air whistle, before starting the train. McLaughlin, flagman on the train, testified that he was on the station platform when plaintiff alighted and helped him off with his grip and plaintiff then walked down the side of the train to his left, towards the crossing, carrying his grip. After plaintiff got off, the flagman said to the conductor, "All right." The conductor then pulled the starting signal. The flagman also confirmed the testimony of the engineer and the conductor that the train did not move for about 10 to 15 seconds after the starting signal was given. As the train was moving off he got on the step of the first class coach and, when he was passing the point of the crossing and getting ready to close the door, he heard plaintiff scream. He then signaled the engineer to stop the train. Scarver, the train porter, testified that he got off the front end of the colored coach as the train stopped at Villa Rica. Two colored passengers got on. He noticed two white passengers get off, a lady and a man.

The man did not fall. After the train moved off, he heard plaintiff scream. He was then in the end of the second class coach. He could not tell where the scream came from but he thought it was right alongside him. Scoggins, an itinerant fruit peddler, testified that he had gone into the station for shelter, intending to stay there until the next morning. He was looking out the window when the train pulled in. He saw the lady get off the train. She walked away out of his sight. He saw plaintiff follow her and turn down the track towards the crossing, carrying his suitcase and leaning towards the side of the train. Plaintiff had passed out of his sight before the accident occurred but, when he heard plaintiff's screams, he rushed out and assisted in giving him first aid. It was shown on cross-examination that defendant had agreed to compensate Scoggins for his loss of wages while attending court. This was about $12.50 to $15.00 a week. By wages he meant his usual profits as a peddler.

Plaintiff depends entirely upon his own testimony to show negligence on the part of defendant. The testimony as to the lighting and condition of the platform is slightly in conflict, although the preponderance tends to show that it was sufficiently lighted and not unsafe, but we may put aside that feature of the case, since it is plain from plaintiff's testimony that the negligence alleged in this respect could not have contributed to the accident. As to the proximate cause of the accident the testimony of plaintiff is vague, indefinite, and inconclusive and is completely overcome by the evidence of the train crew, who are not impeached in any way, even though the evidence of Scoggins be disregarded, which we do not consider is demanded by the showing that defendant had agreed to compensate him for his lost time. Plaintiff, however, relies upon the Georgia statute, Georgia Code, § 94-1108, which is as follows:

"In all actions against railroad companies for damages done to persons or property, proof of injury inflicted by the running of locomotives or cars of such companies shall be prima facie evidence of the want of reasonable skill and care on the part of the servants of the companies in reference to such injury."

As to this it is contended that the presumption created by the statute was equivalent to evidence in favor of plaintiff, remaining throughout the case and sufficient to require submission to the jury.

The Georgia courts have not construed the statute as plaintiff contends. On the contrary, the rule is that, when the presumption is rebutted by evidence, it disappears from the case and the burden is on plaintiff to prove negligence as alleged by a clear preponderance of the evidence. Seaboard Air-Line Railway Co. v. Fountain, 173 Ga. 593, 160 S.E. 789; Holmes v. Georgia Power Co., 44 Ga.App. 588, 162 S.E. 403; Georgia Power Co. v. Braswell, 48 Ga. App. 654, 173 S.E. 763. There are other cases to the same effect which it is unnecessary to quote.

The rule is that, if on all the evidence a verdict in favor of one of the parties should be set aside, it is the duty of the court to direct a verdict for the other party. Pleasants v. Fant, 22 Wall. 116, 22 L.Ed. 780; Small Co. v. Lamborn & Co., 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597. This case comes clearly within the rule. Plaintiff's evidence stops short of showing that he was thrown under the car by the movement of the train either at the point where he attempted to alight or at any other point. That he suffered painful and serious injury is conclusively shown, but it is also certain that it did not occur as alleged. How the accident happened, whether by the negligence of defendant or plaintiff's own negligence, is left to speculation and conjecture.

The record presents no reversible error. Affirmed.

HUTCHESON, Circuit Judge (dissenting).

I think the plaintiff's testimony made out a case for the jury. What, if anything, it lacked for vagueness on direct examination, is made sharply clear on cross.

This is what he said on direct as to the actual occurrence:

"When I started to get off, I noticed the conductor standing out on the platform with his back to the wall, facing the door where I was going to get off. At that time I had my suitcase in my right hand, and overcoat thrown across my left arm, and I started to get down off of the train. I put my left foot down on the step, expecting to catch myself on the ground with my right foot, and when I stepped down on this step with my left foot, the train started, and gave a jerk, and caused me to lose my balance. I began to grab for something with my left hand. I don't know whether I ever got hold of anything or not, but by that time the train had begun to get some speed, and I got so excited that I don't remember anything about what happened then until the time that the wheel of the train hit this leg. So I know, after the wheel had hit this leg, it had either mashed it off, or cut it off, one, because it hurt so bad it had almost taken my breath. I had to gasp for breath, and struggle. The best that I can remember, when I started to get off of the train, they had stopped just a few steps past the corner of the station."

This is his testimony on cross:

"I stepped down on the left foot, and then brought my right foot forward to step down on the ground. Instead of stepping on the next step I didn't step out and pitch forward. When I stepped off with my left foot the train started and gave a jerk. As I remember it, I swung my right foot out, expecting to go on down. That was in the air when the train gave a lurch and started forward. I never did get on the ground with that foot. When the train started and gave this jerk, and caused me to lose my balance, I saw I was going to fall, and I began to grab hold to something with this left hand, and by that time the train was speeding up some, and I got so excited I don't remember. I don't know if I got hold of anything or not. I don't know what became of the overcoat and the bag. I don't know if the minute I began falling I dropped my overcoat and bag. I got so excited I don't know, after I realized that I was falling."

"The accident happened just like I told you about a while ago. I didn't set my suitcase down there, nor trip in no gullies there, nothing of that kind, because, when I fell, I fell from the train."

"As I started down those steps and the train started, it gave a jerk, enough to make me fall—I lost my balance. I would not say I pitched right straight forward. The way I remember, when I saw I was losing my balance, I began to grab for something with this hand. I don't know whether I ever got hold of anything or not. I would not say exactly that I fell at that place where the train had stopped. I got so excited when I realized that I had lost my balance and was falling, that I don't remember exactly what happened after that."

" * * * After I fell I don't know how this thing happened. Not from the time I fell until the time the wheel struck

my leg do I remember anything after I started to fall. I don't remember anything that happened during that whole intervening period. I would not say it happened instantly, but I lost my balance. After the train gave this jerk, that caused me to lose my balance, I got so excited that I don't know what happened after that. I don't remember striking the ground at that particular time."

"It is absolutely not a fact that I got down off of that train, walked down the platform, and across this cross street, and stuck my foot under that train for the purpose of collecting accident insurance. Nothing like that."

I respectfully dissent.

### On Petition for Rehearing.

PER CURIAM.

As neither of the judges who concurred in the judgment of the court in the above numbered and entitled cause is of opinion that the petition for rehearing should be granted, it is ordered that the said petition be, and the same hereby is, denied.